1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LINEAR TECHNOLOGY CORP.,

        Plaintiff,

  vs.

MICREL, INC.

        Defendant.

_____/

No. C-94-1633 MHP

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

On May 9, 1994, plaintiff Linear Technology Corp. ("LTC" or "Linear") brought this action against defendant Micrel, Inc. ("Micrel") alleging infringement of United States Patent Number 4,755,741 (hereinafter the "'741 patent") and the accompanying reexamination certificates.

BACKGROUND

On July 5, 1988 the '741 patent pertaining to adaptive transistor drive circuitry was issued. The asserted claims in this action are claims 22, 32, 36–44, 46, 47 and 49. The '741 Patent covers an adaptive transistor drive circuit for use in electrical devices where a transistor is used "as a switch in a switching voltage regulator." '741 patent, col. 1, l. 17. The claimed inventive improvements in the '741 patent include the ability of the drive circuit to operate across a range of collector currents and temperatures and to operate with high electrical efficiency. Id. at col. 2, ll. 43–66.

On May 14, 1991, the B1 Reexamination Certificate for the '741 Patent ("B1 Certificate") issued, following a reexamination of the '741 Patent ("Reexam I"). On April 28, 1994 an anonymous third party requested reexamination of the '741 patent ("Reexam II").

1

1    LTC sent a notice of possible infringement referencing the '741 Patent to Micrel on April 3,

2    1993, and on May 9, 1994 LTC filed suit against Micrel alleging infringement of the '741 Patent and

3    the B1 Certificate.  Defendant Micrel requested reexamination of the amended '741 Patent on

4    September 9, 1994 ("Reexam III").  Reexam II and Reexam III were merged in January 1995, and

5    on December 26, 1995 the B2 Reexamination Certificate ("B2 Certificate") issued.

6         In the same year that the lawsuit and Reexam III commenced, Micrel began selling the

7    MIC2171, MIC2172, and MIC32172 circuits (the "Accused Products").  Before the December 26,

8    1995 issue of the B2 Certificate Micrel had already shipped 279,655 units of those products.  Micrel

9    later changed the design of its devices to eliminate the circuitry which formed the basis of LTC's

10   infringement contentions.

11        This action was initially assigned to United States District Court Judge Eugene F. Lynch.  On

12   February 26, 1997, Judge Lynch denied Micrel's motion for summary judgment on the question of

13   the validity of the '741 patent, identifying a genuine issue of material fact regarding the applicability

14   of the on-sale bar provision of 35 U.S.C. section 102.  In the same order, Judge Lynch bifurcated this

15   action, permitting the on-sale bar issue to proceed to trial while staying all other issues.

16        Approximately six months later, the case was reassigned to this court, and the court

17   subsequently conducted a bench trial on the issue of on-sale bar invalidity.  On August 19, 1999 this

18   court found the '741 patent invalid under section 102(b), entering judgment for Micrel accordingly.

19   On appeal, the Federal Circuit affirmed this court's decision in part, reversed in part, and remanded.

20   See Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040 (Fed. Cir. 2002), cert denied, 538 U.S. 1052

21   (2003).  The Federal Circuit subsequently denied a petition filed by Micrel for a rehearing of the

22   appeal.  On July 3, 2002, Micrel petitioned the United States Supreme Court for a writ of certiorari

23   to review the judgment of the Federal Circuit.   The Supreme Court denied this petition on May 19,

24   2003.

25        On January 24, 2004 this court conducted a limited claim construction for the '741 Patent

26   and accompanying certificates, construing the word "saturation" to mean "the state in which the

27   ratio of collector-current to base-current is forced lower by excess base current" and the phrase "in

28                                                    2

saturation" to mean "the working of the covered invention consistently at a state of forced current gain."  Memorandum & Order, No. C 94-1633 MHP, slip op. at 12, 17 (Jan. 22, 2004).

On November 11, 2005, the court granted in part and denied in part defendant's motion for summary judgment.  The court held that (1) the B1 Certificate is invalid for indefiniteness, (2) defendant Micrel is entitled to the defense of absolute intervening rights for the 279,655 units of Accused Products shipped before the issuance of the B2 Certificate on December 26, 1995, (3) defendant was not entitled to summary judgment regarding the alleged 307,135 in inventory as of December 26, 1995, (4)  Micrel is entitled to summary judgment that the $500,000 it spent in developing the Accused Products prior to the B2 Certificate's issuance is "substantial preparation" under 35 U.S.C. section 252 and (5) products incorporating defendant's change in design do not infringe any asserted claim.

The court conducted a bench trial of the remaining issues in November of 2005.  The issues before the District Court at this time are (1) whether the '741 patent is enforceable; (2) whether Micrel has infringed claims 22, 32, 36–44, 46–47 and 49 of the '741 patent; (3) if infringement is found, what amount of compensation LTC would be entitled to receive for the damages that resulted; (4) whether Micrel's alleged infringement was willful, such that the damages awarded should be increased; (5) whether because of its change in design and/or because of intervening rights Micrel is entitled to a limitation on its damages, and (6) whether this case is exceptional and attorney fees should be awarded.

Having considered the testimony presented at trial and the other evidence submitted by the parties, the court FINDS for plaintiff Linear and enters the following findings of fact and conclusions of law in accordance with its obligations under Federal Rule of Civil Procedure 52(c). Fed. R. Civ. P. 52(c) (requiring judgment under Rule 52(c) to be supported by findings of fact and conclusions of law).

3

1    <u>TABLE OF CONTENTS</u>

2

3    **<u>Findings of Fact</u>**
     I.    **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
4    II.   **Unenforceability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5          A.    Commercial Activity prior to November 18, 1985 . . . . . . . . . . . . . . . . . . . . . . . . 7
6                1.    Individual Charged with Inequitable Conduct . . . . . . . . . . . . . . . . . . . . . .7
                 2.    Information that was not disclosed to the PTO . . . . . . . . . . . . . . . . . . . 14
7          B.    Non Disclosure of SG1524, LM111 and LM119 . . . . . . . . . . . . . . . . . . . . . . . . . 18
8                1.    Individuals Charged with Inequitable Conduct . . . . . . . . . . . . . . . . . . . 18
9                2.    Prior Art Considered by the PTO During Prosecution . . . . . . . . . . . . . . . 19
                 3.    Other Prior Art disclosed by LTC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
10               4.    Knowledge and Relevance of the SG1524, the LM119
11                     and the LM111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     III.  **Infringement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
12         A.    The Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
13         B.    Saturation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
14         C.    Micrel's Accused Products Infringe the '741 Patent . . . . . . . . . . . . . . . . . . . . . . 45
           D.    Micrel's Testing of a 1990 SG1524 is Irrelevant to an
15               Infringement Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
16   IV.   **Damages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
           A.    Intervening Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
17         B.    Implementation of the 1998 Design-Change . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
18         C.    Period of Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
19         D.    Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
20               1.    Demand for Patented Feature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
                 2.    Absence of Acceptable Non-Infringing Alternatives . . . . . . . . . . . . . . . 72
21                     (a).   Process of Choosing a Switching Regulator . . . . . . . . . . . . . . . .72
22                     (b).   Micrel's Non-Infringing Alternative . . . . . . . . . . . . . . . . . . . . . .75
23                     (c).   Third-Party Non-Infringing Alternatives . . . . . . . . . . . . . . . . . . 78
                 3.    LTC's Manufacturing Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
24               4.    LTC's Market Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92
25                     (a).   Unreliability of Dragun's Market Share Analysis . . . . . . . . . . . 92
26                     (b).   Third Party Estimations of LTC's Market Share . . . . . . . . . . . 101
                 5.    Amount of Lost Profits to be Awarded . . . . . . . . . . . . . . . . . . . . . . . . . .101
27

28

<div style="writing-mode: vertical">**United States District Court** For the Northern District of California</div>

(a).    Lost Sales from Design-In Wins . . . . . . . . . . . . . . . . . . . . . . . . 102
(b).    Price Erosion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
6.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
E.    Reasonable Royalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
V.    **Willful Infringement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
A.    Pre-1994 — Design and Fabrication of the Accused Products . . . . . . . . . . . . 113
1.    Micrel's Copying Efforts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
2.    Concealment of Infringement Activities . . . . . . . . . . . . . . . . . . . . . . 121
B.    1994 Onwards — Good Faith Belief in Invalidity/Unenforceability/
Intervening Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .127
VI.    **Damages Award** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

**Conclusions of Law**
VII.    **Unenforceability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
A.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
B.    Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
C.    Undisclosed Commercial Activity Prior to November 18, 1985 . . . . . . . . . . . . 136
D.    Non-Disclosure of SG1524, LM119 and LM111 . . . . . . . . . . . . . . . . . . . . . . .143
VIII.    **Infringement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
IX.    **Damages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
A.    Intervening Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
B.    Implementation of the 1998 Design-Change . . . . . . . . . . . . . . . . . . . . . . . . . 151
C.    Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .151
1.    Demand for the Patented Feature . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
2.    Absence of Non-Infringing Alternatives . . . . . . . . . . . . . . . . . . . . . . . 156
3.    LTC's Market Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . .159
(a).    Admissibility of Dragun's Expert Testimony . . . . . . . . . . . . . 165
4.    Amount of Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .166
D.    Reasonable Royalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162
X.    **Enhanced Damages**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
A.    Willful Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .164
B.    Attorneys' Fees & Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .169
XI.    **Prejudgment Interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

United States District Court
For the Northern District of California

FINDINGS OF FACT[1]

I.      INTRODUCTION

1.      Plaintiff LTC is a corporation organized and existing under the laws of the State of California and having a principal place of business in Milpitas, California.  Initial Findings of Fact (hereinafter, "IFF") ¶ 1; Def's Exh. A-229.

2.      Defendant Micrel is a corporation organized and existing under the laws of the State of California having its principal place of business in San Jose, California.  IFF ¶ 2; Def's Exh. A-229.

3.      The patent at issue in this case is the '741 patent," entitled "Adaptive Transistor Drive Circuit," as amended by the B1 and B2 Certificates.  The named inventor is Carl Nelson and LTC is the assignee of all right, title and interest in the '741 patent.  Def.'s Exh. A-33; Nelson Testimony, 192:25–193:1.

4.      The '741 patent discloses an "adaptive transistor drive circuit."  Def.'s Exh. A-33 at 1:5–21.  The adaptive transistor drive circuit disclosed in the '741 patent describes "switching regulator circuitry" used to provide regulated voltages or currents.  Nelson Testimony, 143:1–2.

5.      The LT1070 chip manufactured by LTC is a switching voltage regulator invented by Nelson and embodies an aspect of every claim contained in the '741 patent, except for claims 2 and 12.  Nelson Testimony, 139:20–141:18; 199:20–200:17.  However, the LT1070 switching regulator circuit embodies the inventions claimed in all of the claims of the '741 patent that LTC asserts are infringed by Micrel.  Joint Pretrial Conference Statement filed November 14, 2004 (Docket Entry No. 335) (hereinafter "Jt. Pretrial Conf. Stmt.") at ¶ 7.  The LT1070 silicon chip initially constructed and tested by Nelson was essentially a functioning version of the '741 patent.  Nelson Testimony, at 142:18–25; '741 patent, Pl.'s Exh. 220 at LIN018411, 416–17.

**United States District Court**
For the Northern District of California

6.      On November 18, 1986, LTC filed a patent application on an adaptive transistor drive circuit, which led to the issuance of the '741 patent.  IFF 5; Nelson Testimony, 182:8-24, 190:8-16; Pl.'s Exhs. 1, 120.

7.      LTC's LT1070 switching voltage regulator, the first integrated circuit in the family of regulators that includes the LT1171 and LT1172, was introduced in December of 1985.  Dobkin Testimony, 22:8–16; Def.'s Exh. A.  The LT1070 and its progeny were a success, especially with manufacturers of battery-powered, portable electronic devices.  Nelson Testimony, 156:1-157:6.

8.      LTC soon followed the LT1070 with numerous other switching voltage regulators including the adaptive base drive invention covered by the '741 patent, including the LT1071, LT1072, LT1170, LT1171, and LT1172.  Dobkin Testimony, 24:5-25:10; Nelson Testimony, 154:4-17, 203:4-204:19; Blauschild Testimony, 366:11–367:20, 377:6–9.

9.      LTC seeks damages for the alleged infringement of the LT1171 and the LT1172 (the "Patented Products").  Jt. Pretrial Conf. Stmt. at 3:19.

## II.      UNENFORCEABILITY

10.      Micrel asserts that Robert Scott, Carl Nelson and Robert Dobkin engaged in inequitable conduct in the prosecution of the '741 patent.

### A.      Commercial Activity prior to November 18, 1985

#### 1.      Individual Charged With Inequitable Conduct - Robert Scott

11.      Robert Scott is an employee of LTC.  During the prosecution of the '741 patent he was a Product Marketing Manager at LTC.   Scott Testimony, 260:3–5; 261: 3–5.

7

United States District Court

For the Northern District of California

12.     On July 31, 1987 Scott submitted a declaration to the PTO addressing some of the issues raised by the on-sale bar.  Pl.'s Exh. 120 at LIN 000186–87 (hereinafter Def.'s Exh. A-19).  This declaration was submitted with LTC's Information Disclosure statement to the PTO.  In preparing for his declaration, Scott conducted, at the direction of LTC management, an investigation of all sales and advertising activity for the LT1070 before November 18, 1985—the critical date.  Scott Testimony, 277:23–288:21; 264:24–265:5.  All information that Scott found, or of which he was aware, was disclosed in his declaration to the PTO.  Id. at 265:1–11; 287:23–288:21; Def.'s Exh. A-19.

13.     In his declaration, Scott discussed *inter alia*: his oral communications with LTC's independent sales representatives and distributors concerning the LT1070 [Def.'s Exh. A-19 ¶ 3]; LTC's July 1985 sales training meeting [Id., ¶¶ 4–7]; two meetings that Dobkin, vice-president of LTC, had with customers at which reference was made to the LT1070 [Id., ¶ 8]; LTC's receipt of sample orders for the LT1070 [Id., ¶¶ 9–10]; Scott's recollection of a telex order for the LT1070 received from Jermyn, S.A. [Id., ¶ 11]; his November 6, 1985 telex to LTC's area sales managers, alerting them to the fact that LTC had received requests for samples and production orders for the LT1070 on or before November 6, 1985 [Id., ¶¶ 13–15; Scott Testimony, 272:17–273:8]; LTC's November 1, 1985 *Newsline* discussing the LT1070 [Def.'s Exh. A-19 ¶ 12]; an article, published in the *Electronic Design* magazine about the LT1070 and a subsequent LTC *Newsline* article [Id., ¶¶ 19–20]; and the LTC Released Product Listing form for the LT1070.  Id., ¶ 16.

14.     Although Scott disclosed the receipt of pre-critical date orders for the LT1070 to the PTO, he did not disclose the use that LTC made of those orders by putting them in the "will advise" category.  Thus, neither LTC's Information Disclosure Statement concerning on-sale bar issues nor the accompanying LTC declarations (including Scott's declaration) disclosed that customers Microlog, Neye, Bacher, and Svensk all placed orders for LT1070s prior to the critical date, that LTC did not reject these orders but instead carried them on its books under the "will advise" rubric, and that LTC

8

United States District Court

For the Northern District of California

1   converted these orders into LT1070 orders shortly after the critical date and then shipped the

2   products to the customers without any further action on the part of the customers.  Compare LTC's

3   Information Disclosure Statement, Exh. 120 at LIN 00070-255, with IFF  ¶¶ 83–96.  See also IFF ¶

4   92; Scott Testimony, 293:14–21.

5

6   15.     With respect to the requests for samples and product orders, Scott characterized them as

7   "typically unsolicited requests made by LTC's independent sales representatives and distributors."

8   Def.'s Exh. A-19 ¶ 11.  According to Scott the "unsolicited requests and orders" received before the

9   critical date were ignored: "On information and belief, however, no LT1070 devices were offered

10  for sale or shipped by LTC prior to November 18, 1985."  Def.'s Exh. A-19 ¶ 14.

11

12                          (a).     1994 Document Discoveries

13  16.     In January of 1994 Scott asked Daniel Wark, who was at that time serving as LTC's Manager

14  of Production Control and Customer Service, to search for sales orders, sales and activity reports

15  from 1984–1986.  Wark searched for these materials in a remote LTC warehouse located a few miles

16  from the LTC headquarters and discovered a sales order report for the relevant period of time.  Wark

17  gave this report to Scott, who noticed that a number of entries were for the LT1070s and were

18  associated with sales orders that predated the critical date.  Wark Testimony, 395:20–396–25;

19  393:4–5; Def.'s Exh. A-571 ¶ 8.

20

21  17.     Consequently, in February 1994, both Scott and Wark returned to the warehouse to search

22  for any further information relating to the LT1070.  Scott Testimony, 277:8–25, 304:1–4,

23  304:24–305:2; Wark Testimony, 396:10–16; Def.'s Exh. A-571 ¶ 15.

24

25  18.     The warehouse comprised a massive open storage area containing myriad objects—old

26  electronics equipment, cars, two levels of pallets of boxes of documents, and no index specifying the

27  contents of the boxes.  After determining where the Linear Technology section of the warehouse was

28                                          9

located, Scott and Wark opened and searched through the boxes there for other information concerning the LT1070.  Scott Testimony, 277:11–21, Wark Testimony, 396:22–397:13.

19.     During this February 1994 search, Scott and Wark located approximately three additional bound computer printouts which contained information related to the LT1070 for the relevant time period.  Scott Testimony, 277:22–25, 278:7–10, 304:1–7, 304:24–305:2; Wark Testimony, 396:10–16, 402:24–403:1; Def.'s Exh. A-571 ¶ 15.

20.     When Scott determined that the additional bound computer printouts contained pre-critical date LT1070 customer order information, he gave all the printouts to LTC's attorneys and suggested to Wark that he should prepare a declaration discussing the discoveries.  Scott Testimony, 277:22–278:2, 305:3–9, 306:19–25; Wark Testimony, 397:17–23; Rowland Testimony, 955:18–23, 956:13–18.

21.     In June of 1994, Wark filed a declaration with the PTO during Reexam II.  Scott Testimony, 277:1–278:4; Exh. A-571; Wark Testimony, 395:7–16; Rowland Testimony, 951:24–963:23.

22.     Wark and Scott were not aware of the existence of the bound computer printouts prior to 1994.  Scott Testimony, 274:2–6; Wark Testimony, 397:14–16.

23.     The focus of Scott's search in 1994 was not on the "will-advise" notations found on some of the computer printout pages and thus he did not investigate the relevance of these notations.  Scott's focus in 1994 was on the fact that the bound computer printouts contained LT1070 entries from the November 1985 time period.  Scott Testimony, 274:25–275:10, 302:18–303:16, 305:3–9.

24.     The Wark declaration provided excerpts from LTC's Sales Order Reports and Bookings by Customer Reports ("Booking reports"), which contained line items showing "will advise" entries.

10

United States District Court

For the Northern District of California

1   Without knowing more about the "will-advise" procedure, it was not possible to understand that

2   these entries were made in connection with orders for the LT1070 prior to the critical date.

3

4   25.    The Wark declaration did not disclose that the "will advise" procedure had been used in

5   connection with the LT1070, or discuss it in any way.  See Def.'s Exh. A-571; compare id. at

6   LIN00871–84 with IFF ¶ 92.

7

8   26.    At the time he reviewed the documents, Wark did not know that the "will-advise" notations

9   were significant and thus he had no reason to ask Scott what the entries meant.  Wark Testimony,

10  403:2–8.

11

12                  **(b).    Will-Advise Notations**

13  27.    During his initial deposition on August 14, 1996, Scott was asked whether he knew what the

14  "will-advise means under the product number column on the report" containing entries for LT1070s.

15  Scott responded that he "did not know what 'will-advise' meant.  See Scott Testimony, 308:11–16.

16

17  28.    During his subsequent deposition on April 3, 1997, Scott testified that during 1987 he was

18  aware of the "will-advise" designation "as a very general term to flag defects in requests and orders

19  that came in."  Scott Testimony, 297:3–6.  However, at trial, Scott testified that he was unaware

20  when he signed his declaration to the PTO in 1987 that any orders for the LT1070 had been

21  designated as "will-advise" entries in LTC's booking system.  Scott Testimony, 295:15–24.

22

23  29.    Micrel's reliance upon this deposition testimony to impeach Scott is unpersuasive.  Scott

24  initially testified that he was not aware of what will-advise meant in one particular instance—the

25  meaning of the will-advise notations entered in the column next to the LT1070 pre-critical date

26  orders.  Later during the on-sale bar trial, Scott testified that he had a general awareness of the term.

27  Scott's prior testimony is not inconsistent with his trial testimony since a general understanding of

28  the use of the term does not suggest an understanding of its use with respect to the LT1070 orders.

30.     Serena Lucey was working as a customer service representative during the period of the initial prosecution.  Lucey Dep. at 7:3–8.  At her deposition, Lucey testified that after receiving a telex from a foreign distributor requesting a product that had not yet been released, the customer service department would contact the marketing department to verify if the product had been released.  At that time, the marketing department comprised Scott and a "couple more people."  Scott Testimony, 260:10–18.  If the product had not been released, then a "will-advise" category would be used.  Lucey Dep. at 37:6–38:25.

31.     During the initial trial on the on-sale bar issue, Lucey testified that Scott was not necessarily aware of the will-advise procedure.  According to Lucey, his familiarity lay with whether the product had been officially released.   Lucey Testimony (1998 Trial), 578:14–23.

32.     Scott testified that he asked individuals in customer service whether any of the orders referenced in his telex had been entered with the notation "will-advise."  Scott did not receive a response from customer service and did not follow up with the department.  Scott Testimony, 296:16–297:7.

33.      Scott testified that it would have been not simply important, but "vital," for the PTO to have known that the orders referred to in his 1987 declaration had been entered into LTC's records as "will advise" orders.  Scott Testimony, 295:12–19.

34.     Mark Rowland, one of the prosecuting attorneys in the prosecution which resulted in the issuance of the '741 patent, testified that if he had known that production orders were entered into the LTC bookings system as "will advise" entries, he would have considered that fact to be information that *should have been disclosed* to the PTO.  Rowland Testimony, 932:15–17, 943:10–24 (emphasis added).

35.     LTC concedes that the patent examiner was totally dependent on what LTC provided him regarding LTC's internal documents and had no way of understanding that the LT1070 orders were originally handled as "will advise" transactions prior to the critical date.  Rowland Testimony, 939:15–940:13.

### (c).     Manual of Patent Examination Procedure

36.     Rowland testified that he was familiar with the PTO's Manual of Patent Examination Procedure ("MPEP") and that he sometimes used it as a reference resource in patent prosecution.  Rowland, 935:11–13.

37.     The MPEP states in its foreword that its aim is to provide "patent examiners, applicants, attorneys, agents and representatives. . . a reference work on the practices and procedures . . . [incident] to the prosecution."  In the edition in effect at the time of the prosecution of the '741 patent, under the heading "Significant Factors Indicative of Commercial Exploitation," the MPEP notes that the following activities "should be used by the examiner as indicia of . . . subjective intent" to engage in "premature commercial exploitation" of a "completed invention":

- Preparation of various contemporaneous "commercial documents," e.g., orders, invoices, receipts, delivery schedules;
- Preparation of price lists;
- Display of samples to prospective customers;
- Demonstration of models or prototypes;
- Use of an invention where an admission fee is charged;
- Advertising in publicity releases, brochures and various periodicals.

See MPEP § 2125.03 (8th Ed., Oct. 1986 Rev.) (hereinafter "Def.'s Exh. A-690").  The manual states that "the above activities may be determinative of 'commercial exploitation' even though (1) prices are estimated rather than established, (2) no commercial production runs have been made, and (3) the invention is never actually sold."  Def.'s Exh. A- 690 § 2125.03.

United States District Court

For the Northern District of California

38.     Further, the MPEP notes that whether commercial activity is "on-sale" under section 102(b) "depends upon the circumstance of the activity—the basic indicator being the subjective intent of the inventor."  MPEP § 2133.03(e)(1) (5th Ed., Oct. 1987, Rev.).  Thus, "*any* [pre-critical date activity is an] attempt at market penetration" which invalidates a patent.  Id. (emphasis added).

### 2.      Information that was not Disclosed to the PTO

#### (a).     Preliminary Data Sheet

39.      In his declaration, Scott stated that neither the preliminary data sheet nor the 1986 Data Book was publicly available or distributed by LTC prior to November 19, 1985.  Def.'s Exh. A-19 ¶ 18.

40.     LTC's Information Disclosure Statement and the attached declarations did not disclose that the preliminary datasheet for the LT1070 (drafted by the inventor, Carl Nelson) was distributed to a number of potential customers prior to the critical date by LTC's sales representatives.  Compare LTC's Information Disclosure Statement, Exh. 120 at LIN 00070–255 (all declarations), with IFF ¶¶ 28, 42, 43, 45, 48.

41.     There is no evidence in the record establishing that Scott was aware before the filing of his declaration that these distributions of the preliminary datasheet had occurred.

#### (b).     Discussions of the LT1070 at the July 1985 Sales Meeting

42.     Scott disclosed in his declaration filed with the PTO that the LT1070 was discussed at a sales meeting held on July 21–23, 1985.  See Exh. A-19.  He stated in his declaration that the LT1070 presentation at the meeting was "solely to encourage the sales representatives and distributors to identify and familiarize themselves with potential users of the [LT1070] product."  Id. at LIN 00186.  However, at the first trial he testified that LTC

1   expected its sales representatives and distributors to actually discuss the LT1070 and its

2   functions with customers and explore possible applications.  IFF ¶ 36.

3

4   43.     Scott did not disclose to the PTO that amongst the attendees at the July meeting were

5   actual customers for the LT1070, namely its international distributors Microlog, Neye, and

6   Svensk.  These distributors purchased products from LTC and then resold them to their own

7   customers.  These very same customers also submitted orders for the LT1070 prior to the

8   critical date.  Compare Exh. 120 at LIN 00186–87, with IFF ¶¶ 20, 32, and 92.

9

10  44.     There is no evidence in the record that Scott was aware in 1987 that some of the

11  attendees at the July sales meeting were potential customers.

12

13  45.     LTC's Information Disclosure Statement and the attached declarations failed to

14  disclose that the inventor, Nelson, made a presentation about the LT1070 at the meeting in

15  July of 1985.  This presentation included discussion of an application circuit diagram which

16  demonstrated how the LT1070 could actually be used to those in the audience.  Compare

17  Pl.'s Exh. 120 at LIN 00070–255 with IFF ¶¶ 32–34.

18

19  46.     Although inventor Nelson was involved in commercial activity before the critical

20  date, he did not file a declaration with the PTO during the original prosecution of the '741

21  patent.  In 1995 during Reexam II, Nelson did file a declaration about the "commercial

22  success" of the LT1070, but failed to mention his marketing activities for the LT1070 prior

23  to the critical date.  See Exh. 123 at 860–909.

24

25  47.     At the July 1985 sales training meeting and in discussions with, or presentations to,

26  customers.  Nelson was permitted to discuss only the technical details of LTC products, not

27  details of his inventions or any sales information.  He was not permitted to offer the LT1070

28

United States District Court

For the Northern District of California

1  for sale—"If the word 'price' or 'availability' came out of my mouth the salesman would

2  cut me off at the knees."  Nelson Testimony, 201:4-18.

3

4  48.      There is no evidence in the record that Scott was aware in 1987 that Nelson had

5  spoken with LTC's representatives and distributors or to customers about the LT1070

6  during the July 1985 sales training meeting.

7

8                     **(c).     Contact with Potential Customers**

9  49.      LTC's Information Disclosure Statement and the attached declarations also failed to

10 disclose the extent of pre-critical date contacts by LTC with potential customers for the

11 LT1070.  Although Scott stated in his declaration that Dobkin had discussed the LT1070

12 during visits with two LTC customers, see Exh. 120 at LIN 00187, he did not disclose that

13 Nelson also gave customer presentations on the LT1070 to Data General and IBM prior to

14 the critical date.  See IFF ¶¶ 72–74.  Nor did Scott disclose that prior to the critical date

15 LTC's sales representatives actively promoted the product to many customers, including

16 Sperry, Honeywell, and Norand.  Compare Pl.'s Exh. 120 at LIN 00070–255, with IFF ¶¶

17 41–52.

18

19 50.      There is no evidence in the record that Scott was aware in 1987 of the extent of the

20 pre-critical date contacts by LTC's representatives with potential customers.

21

22                       **(d).     Will-Advise Entries**

23 51.      LTC's Information Disclosure Statement and the attached declarations failed to

24 disclose that as a result of the commercial activity before the critical date, LTC was able to

25 formally book orders for more than 1,700 LT1070s in the four days immediately following

26 the critical date.  Compare Pl.'s Exh. 120 at LIN 00070–255, with IFF ¶¶ 97–99.

27

28

52.     It is undisputed that LTC received orders or "requests" for LT1070s prior to the critical date. Since the LT1070 was not yet formally released, these requests could not be entered into LTC's order entry system as orders for the LT1070 when they were received. Instead, LTC used the phrase "will advise" as an electronic marker or placeholder in LTC's order entry system for the requested LT1070s. LTC kept track of these "will advise" orders in its Orders On Hold report. Once the part number for the LT1070s was entered into LTC's computerized bookings system, the "will advise" entry was deleted and the "requests" were formally booked as "orders" for the product. IFF ¶¶ 83–90.

53.     For each of these "will advise" designated transactions, no further communication from the customer was required for LTC to process and ship the order. LTC simply entered the order for the LT1070s once the part number had been added to LTC's computerized database and, thereafter, shipped the LT1070s to fill the orders. Included in these "will advise" transactions were orders for 50 LT1070s from Microlog, 50 LT1070s from Neye, 100 LT1070s from Bacher, and 600 LT1070s from Svensk—all received and entered into the order entry system as "will advise" orders prior to the critical date. IFF ¶¶ 91–95 (citing Def.'s Exh. A–80).

54.     Nevertheless, neither LTC's Information Disclosure Statement concerning on-sale bar issues nor the accompanying LTC declarations disclosed that customers Microlog, Neye, Bacher, and Svensk all placed LT1070 orders prior to the critical date, that LTC did not reject these orders but instead carried them on its books under the "will advise" designation, and that LTC converted these orders into LT1070 orders shortly after the critical date and then shipped them to the customers without any further action on the part of the customers. Compare Pl.'s Exh. 120 at LIN 00070–255, with IFF ¶¶ 83–96.

55.     The entry of the Neye, Microlog and other LT1070 orders into LTC's order entry system as orders with "will advise" notations prior to the critical date was in itself the

1  preparation of a "contemporaneous 'commercial' document" in electronic form.  See Exh.

2  A-690.  The use of the "will advise" designation to enter the LT1070 orders into LTC's

3

4   bookings system also resulted in acknowledgments of these orders being issued.  IFF ¶ 87.

5  These order acknowledgments were a second "contemporaneous 'commercial' document"

6  under the MPEP.

7

8  56.     Although LTC disclosed the sales order reports, they did not disclose the relevance

9  of the "will-advise" entries.

10

11  **B.      Non-Disclosure of SG1524, LM111 and LM119**

12                **1.      Individuals Charged With Inequitable Conduct**

13                      **(a).     Carl Nelson**

14  57.     As the named inventor of the '741 patent, Nelson was intimately involved the

15  drafting and prosecution of the '741 patent.  See '741 patent; Pl.'s Exh. 120 at LIN 00060;

16  Nelson Testimony, 216:24–217:4.

17

18                      **(b).     Robert Dobkin**

19  58.     Dobkin was one of the founders of LTC in 1981, and has been a vice-president of

20  the company since that time.  Dobkin Testimony, 11:7,14–15.  Dobkin was intimately

21  involved in the drafting and prosecution of the '741 patent.  During the 1980s, if an engineer

22  thought his invention was patentable, he would consult with Dobkin, who was at the time

23  the *de facto* patent committee at LTC, and together they would make a decision whether to

24  file a patent application.  Dobkin Testimony, 101:13–102:20.

25

26  59.     Dobkin authorized the filing of at least three patents on Nelson's invention,

27  including the '741 patent.  Dobkin Testimony, 104:2–25.  Dobkin and Nelson exchanged

28  ideas and decided on which aspects of the invention to file a patent application.  Nelson

United States District Court

For the Northern District of California

1   Testimony, 215:25–216:4.  Additionally, Dobkin was in control of the copies of documents

2   filed with or received from the PTO regarding prosecution of the '741 patent.  Dobkin

3   Testimony, 75:25–76:7; 102:15–20.

4

5   60.     From occasionally speaking with Mr. Nelson about his progress in designing the

6   circuit, Dobkin was familiar with the circuitry of Nelson's invention.  Dobkin Testimony,

7   103:21–104:1.

8

9                    **2.      Prior Art Considered by the PTO During Prosecution**

10  61.     During the original prosecution of the '741 patent, the PTO examiner rejected some

11  of the patentee's claim because of a prior art patent that was issued to Lethellier, U.S. Patent

12  No. 4,595,974.  The Patent Examiner also considered two prior patents: U.S. Patents Nos.

13  4,654,769 ("Melamed") and 4,645,945 ("De Sartre").  See Pl.'s Exh. 120 at LIN 00062, LIN

14  00067.  All of these patents claimed devices which operated in saturation.

15

16                            **(a).     Lethellier**

17  62.     Lethellier discloses a circuit in which the output transistor operates in saturation.

18  The PTO examiner recognized that the Lethellier transistor operated in saturation, stating,

19  "Lethellier discloses the transistor operated at a chosen point in saturation . . ."  Pl.'s Exh.

20  120 at LIN 00063.

21

22  63.     The Lethellier circuit includes a Baker clamp.  Nelson Testimony, 191:9–11; Pl.'s

23  Exh. 453 at col. 1, ll. 60–64; col. 3,  ll. 46–62.  Baker clamps are a combination of diodes

24  and circuits that establish differing voltage states at the two nodes.  If properly used, a Baker

25  clamp can keep a device out of saturation.  McAlexander Testimony, 663:3–664:7.  Nelson

26  understood that this Baker clamp would work to prevent the transistor from going into

27  saturation and thus the Lethellier circuit could only operate in saturation at a single

28  operating point.  Nelson Testimony, 191:9–192:17.

United States District Court

For the Northern District of California

**(b).   Melamed**

64.     Melamed also discloses a circuit wherein the switching transistor operates in saturation.  Nelson Testimony, 193:7–18, 194:8–12.  Melamed also discloses using a Baker clamp.  Nelson Testimony, 194:8–15; Pl.'s Exh. 452 at col. 1, ll.66–col. 2, ll. 24, col. 3, ll. 31–37.

65.      The Melamed circuit was designed to operate the transistor in saturation while staying near the edge of saturation.  Nelson Testimony, 195:21–22; Pl.'s Exh. 452 at col. 1, ll. 66–col. 2, l. 24.

66.     The PTO examiner recognized that the Melamed circuit operated in saturation, stating, "Melamed [and another reference] both disclose circuits for maintaining transistors at a certain level of saturation."  Pl.'s Exh. 120 at LIN 00064; see also Nelson Testimony, 194:4–15.

67.     Nelson understood that the Melamed circuit was developed to operate a transistor at a single operating point because of the types of diodes used by the designer.  The designer had a choice between diodes that had a very low forward drop to keep the transistor out of saturation and diodes with a high forward voltage which would keep the circuit deep in saturation.  Once the designer of this circuit decided upon the diodes he would use for production, the circuit's condition of operation would be fixed since any variance in temperature or current would move the circuit in and out of the desired saturation condition.  Nelson Testimony, 195:19–195:22.

**(c).   De Sartre**

68.     This patent discloses an adaptive base drive that operates in saturation.  This adaptive base drive is generated through multiple paths and thus it is not a viable alternative for a switching regulator.  Nelson Testimony, 196:3–8; see Pl.'s Exh. 454.

United States District Court

For the Northern District of California

1

### 3.       Other Prior Art Disclosed by LTC

2   69.     LTC disclosed to the PTO all of the prior art that Nelson and Dobkin considered

3   relevant to the invention of the '741 patent.  Nelson Testimony, 196:19–199:1, 200:3–19;

4   Pl.'s Exh. 120 at LIN 00058, LIN 00070–00075.

5

6   70.      LTC disclosed multiple prior art items, including the LM117, the LM195, the

7   LT1005, the LT1001, and U.S. Patent No. 4,228,404, to the PTO during the original

8   prosecution of the '741 patent.  Nelson Testimony, 197:4–24; Pl.'s Exh. 120 at LIN

9   00070–00119.

10

11   71.     The LM117, the LM195, the LT1005, and U.S. Patent No. 4,228,404 were all

12   "boost" circuits, employing adaptive base drives that varied the base drive to a transistor.

13   Nelson Testimony, 197:10–198:8; Pl.'s Exh. 120 at LIN 00071–00072.

14

15   72.     The LT1001 employed a tied-back emitter in the transistor to limit the depth of

16   saturation of a transistor.  Nelson Testimony, 169:21–24, 197:22–24, 198:9–12; Pl.'s Exh.

17   120 at LIN 00072.

18

19   73.     The LM117 is a regulator, but not a switching regulator like the LT1070.  Dobkin

20   Testimony, 105:9–12.  The transistor in the LM117 does not go into saturation.  Dobkin

21   Testimony, 105:16–17.

22

23           ### 4.       Knowledge and Relevance of the SG1524, the LM119 and

24                           the LM111

25   74.     In the first reexamination of the '741 patent ("Reexam I"), a third-party brought a

26   1976 publication by Mammano which described the operation of the SG1524 to the

27   attention of the Patent Office.  The Patent office rejected claim 32 as anticipated by

28

United States District Court

For the Northern District of California

1    Mammano.  Reexam I, Paper No. 6 at LIN 00355.  In response to the rejection, LTC

2    amended claim 32, narrowing the scope of the claim.

3

4    75.    Claim 32 of the '741 patent was not included in the original patent application.

5    Nelson Testimony, 253:23–25.  Claim 32 does not include the adaptive base drive circuitry

6    of the invention, nor does it include the tied-back emitter, but describes a modified Baker

7    clamp.  Nelson Testimony, 254:8–256:2.

8

9    76.    This modified Baker clamp, with tighter control of the voltage drop in the circuit as

10   well as the ability to choose whether to have a negative or positive temperature coefficient,

11   allows the user of the transistor to control the forced beta in the switch.  Prior to Nelson's

12   invention, Baker clamps had resistors in the emitter base junction of the driver and power

13   transistor as opposed to within the circuit.  Thus, when the current varied, transistors using

14   these prior Baker clamps would experience a voltage drop across the resistors with a

15   negative temperature coefficient—an outcome that was undesirable.  Nelson Testimony,

16   254:15–256:2.

17

18   77.    In response to the rejection of claim 32, LTC recognized that the LM111 and LM119

19   contained circuits similar in structure to the circuit discussed in the Mammano article.

20   Thus, LTC brought these two circuits to the examiner's attention.  Rowland Testimony,

21   949:2–20; Pl.'s Exh. 121 at LIN 00370–00378.

22

23   78.    As part of that disclosure, Rowland (one of the prosecuting attorneys) stated,

24   "because the Examiner has apparently viewed Mammano as operating in saturation— which

25   . . . patentee believes is an erroneous understanding of Mammano— patentee hereby brings

26   the LM111 and LM119 to the attention of the Examiner."  This disclosure was based on

27   information conveyed to Rowland by Nelson and/or Dobkin.  Rowland Testimony,

28   950:3–951:10; Pl.'s Exh. 121 at LIN 00376.

22

79.     Additionally, in its response to the PTO examiner's rejection of claim 32 in light of Mammano, LTC argued that Mammano is not intended to operate in saturation but that it is possible, by careful selection of device geometries and voltages, to operate a transistor in or out of saturation:

> [The rejected claim] describes a circuit which (1) operates a transistor in saturation . . . Mammano, however, does not appear to work this way.
> It is possible, by careful selection of device geometries and base-emitter voltages, to cause Mammano's circuit to operate transistor Q5 either in, or out of, saturation. Nothing in Mammano, however, states or suggests to choose those geometries and base-emitter voltages so that any transistor in Figure 13—and, in particular, transistor Q5—actually operates in saturation. . . . Mammano suggests, however, that his circuit is designed to prevent transistor Q5 from going into saturation. . . . Mammano also states that the circuit of Figure 13 is an "antisaturation network for fast response . . .".  This statement, particularly coupled with the fact that transistor Q5 is a driver transistor, suggests that the purpose of the circuit in Figure 13 is to prevent—rather than to cause and limit—saturation of transistor Q5.  To maximize the response or speed of the circuit of Figure 13 and transistor Q5, the desire would be to operate transistor Q5 in its active region—not in saturation.

Pl.'s Exh. 121 at LIN 00366–00367

80.     LTC admits that "the circuit configuration of Mammano is like that included in the LM111 and LM119 devices."  Reexam I, Paper No. 8 at LIN 00376.  See also Nelson Testimony, 250:22–251:3.

81.     LTC did not disclose the LM111 and LM119 devices to the Patent Office in the initial prosecution.

### (a).   SG1524

82.     The SG1524 is a switching regulator controller with no power device.  It was originally manufactured by Silicon General.  However, pursuant to a product exchange agreement, LTC obtained manufacturing mask sets and documentation for the device from Silicon General.  Dobkin Testimony, 76:15–17, 76:21–77:2; Def.'s Exh. A-723; Pl.'s Exh. 457 at 3.  Masks are the photographic plates used to place the particular pattern on a chip during production.  Dobkin Testimony, 77:18–19.

83.     Using the masks and documentation provided under the product exchange agreement, LTC manufactured an LTC version of the SG1524, with some modifications to the chip design.  Dobkin Testimony, 76:12–77:6, 77:20–24, 78:10–21.  These modifications related to undervoltage lockout circuitry and have no relation to the current dispute between the parties.  Dobkin Testimony, 77:3–9.

84.     Dobkin was familiar with LTC's SG1524.  Dobkin Testimony, 76:12–17, 78:10–21.  Nelson was also familiar with the SG1524 because he reviewed the information that Silicon General provided to LTC about the SG1524.  Nelson Testimony, 205:18–24.

85.     The LTC SG1524 employs an output transistor with a fixed base drive as opposed to an adaptive base drive.  Dobkin Testimony, 77:20–78:4.  The output transistor of the LTC SG1524 operates out of saturation.  Id. at 78:7–15.  Dobkin and Nelson both knew that the SG1524 employed "clamp" circuitry that could be used to keep the drive transistor out of saturation.  Id. at 78:7–9; Nelson Testimony, 252:2–8.

86.     Based on tests of the propagation delay of the LTC SG1524 output transistor, Dobkin determined that the output transistor did not operate in saturation.  Dobkin Testimony, 78:10–23, 110:24–111:9, 139:5–17, 144:18–22.  Propagation delay is a measurement of the time difference between the initiation and completion of the shut-down process of a transistor.  Nelson Testimony, 246:2–8.  If propagation delay increases considerably, then the device has begun to enter into saturation.  Conversely an absence of propagation delay problems indicates that the transistor is operating well out of the saturation region.  Nelson Testimony, 246:14–247:14.

87.     Dobkin did not conduct any direct tests of the LTC SG1524 or the Silicon General SG1524 to determine whether it operated in or out of saturation—such as conducting measurements of forced beta.  Dobkin Testimony, 78:10–23; 110:25–111:9.

24

United States District Court

For the Northern District of California

88.     The 1986 LTC SG1524 and the 1984 Silicon General SG1524 datasheets are consistent with Dobkin's understanding that the SG1524 products did not operate with the output transistor in saturation.  Dobkin determined that based on calculations of the output transistor saturation voltage, these devices did not operate in saturation.  Dobkin Testimony, 145:11–149:7; Def.'s Exh. A-323; Def.'s Exh. A-325; Def.'s Exh. A-715.

89.     In the December 1985 Linear *Newsline*, publicizing the upcoming LT1070, LTC compared the SG1524 to the LT1070, stating that "the fact that the LT1070 has only 5 pins might suggest that it does not have many features compared to presently available control chips like the SG1524 family. Au Contraire!!"  Exh. 120 at LIN 00227.

90.     Micrel's expert witness Mr. McAlexander testified that in 1976, Mammano described the SG1524 as employing "an anti-saturation, and that's classically understood to be a circuit that keeps the device out of saturation."  McAlexander Testimony, 819:23–20:23; Def.'s Exh. A-723 at M002949.  However, early industry usage of "anti-saturation" differed from the use of the term in the patent at issue as the anti-saturation feature in the '741 patent is used to limit the depth of saturation.  See Nelson Testimony, 202:20–24; Dobkin Testimony, 109:23–110:1 (noting that the circuitry in the patent is "giving controlled saturation or controlled anti-saturation, in the saturation region.  It's not keeping it from saturation.").

91.     The adaptive anti-saturation feature of the '741 patent comprises the clamp circuitry or the tie-back emitter in combination with the base drive.   This circuitry controls the point in saturation at which the transistor operates.  Dobkin Testimony, 140:6–141:13.

### (b).   LM119

92.     The LM119 is a high-speed voltage comparator.  Dobkin Testimony, 79:20–80:13. This is a specialized circuit that performs a comparison between two voltages, changing the

25

United States District Court

For the Northern District of California

output state of the circuit when one voltage exceeds the value of the other.  Dobkin Testimony, 79:24–80:11.  Comparators are covered by the express terms of the '741 patent, col. 13, ll. 7–15.

93.     Dobkin designed the LM119 to use an output transistor with a fixed base drive as opposed to an adaptive base drive.  Dobkin Testimony, 80:14–21.  Dobkin designed this circuit while employed at National Semiconductor.  Dobkin was employed as a circuit designer at National Semiconductor for eleven years.  Id. at 96:4–10.

94.     Dobkin wanted a transistor with a fast response and thus in his design of the LM119 Dobkin included a Baker clamp circuit to keep the output transistor out of saturation. Dobkin Testimony, 81:25–82:7, 111:25–112:10; Nelson Testimony, 252:14–16.

95.     If the LM119 did not employ a Baker clamp, in extreme operating conditions the output transistor of the LM119 might saturate.  However the Baker clamp of the LM119 prevented it from saturating.  Blauschild Testimony, 491:5–492:17; Pl.'s Exh. 121 at LIN 00375.

96.     In order to ensure that the device was operating out of saturation, Dobkin and Nelson conducted tests to measure the speed (or propagation delay) of the LM119.  Nelson 245:17–20.

97.     Nelson and Dobkin did not take any direct measurements of the LM111 and LM119, such as attempting to compute forced beta.  Nelson Testimony, 245:21–246:1, 247:10–18. Dobkin Testimony, 82:6–12.

98.     Micrel has not introduced any evidence that would suggest that the output transistor of the LM119 operated in saturation.

United States District Court

For the Northern District of California

99.     Dobkin and Nelson did not think that the LM119 was relevant as prior art for the prosecution of the '741 patent because it did not operate in saturation and employed outdated technology.  <u>See</u> Nelson Testimony, 200:7–19 (noting that he did not consider the SG1524, LM119 and LM111 because they were designed for a particular purpose).  At trial, when asked why he did not disclose the LM119 as prior art, Dobkin responded:

A.     I didn't give any consideration. I didn't even think of it.
Q.     And, again, can you explain to the court why that's something that would not have occurred to a designer such as yourself?
A.     Because what Mr. Nelson had done is he had run the transistor in SAT[uration] to make the switching regulator more efficient. And he had adaptively changed th drive to the circuit to make the SAT[uration] stay constant over a wide range of loads, which was just different than any of those earlier circuits. I didn't even think of those.

Dobkin Testimony, 82:17–25.

### (c).     <u>The LM111</u>

100.    The LM111 was also a device manufactured by National Semiconductor.  Pl.'s Exh. 121 at LIN 00374.

101.    Although Dobkin did not design the LM111, he was familiar with the device because he was the manager of the group that manufactured it.   Dobkin Testimony, 83:2–8.

102.    Prior to his employment at LTC, Nelson was also employed by National Semiconductor.  While employed by National Semiconductor, Nelson became familiar with the LM111.  Nelson Testimony, 204:20–205:6.  After joining LTC, Nelson worked on LTC's version of the LM111.  <u>Id.</u> at 205:7–8.

103.    The LM111 is a voltage comparator like the LM119.  Dobkin Testimony, 83:9–10; Pl.'s Exh. 121 at LIN 00371.

104.    Like the LM119, the LM111 employs an output transistor.  The LM111 does not employ an adaptive base drive for the output transistor.  Dobkin Testimony, 83:11–12.

27

105.    Like the LM119, the LM111 operates out of saturation.  It employs a Baker clamp circuit which prevents it from saturating.  Dobkin Testimony, 83:13–20, 144:18–22; Nelson Testimony,  252:14–16; Blauschild Testimony, 491:5–492:17; Pl.'s Exh. 121 at LIN 00375.

106.    Nelson took propagation delay measurements on at least one version of the LM111.  Nelson's propagation delay measurements showed that the output transistor of the LM111 did not saturate.  Nelson Testimony, 245:15–20.  Dobkin also tested the speed of the LM111 and concluded that it operated out of saturation.  Dobkin Testimony, 83:15–20.

107.    Micrel has not introduced any evidence that would suggest that the output transistor of the LM111 operates in saturation.

## III.    INFRINGEMENT

### A.    The Invention

108.    The '741 patent, issued on July 5, 1988, teaches that in many applications, in order to optimize efficiency, it is desirable that a transistor operate in saturation during the on-condition.  The patent states that "typically, minimum power dissipation, and optimum overall efficiency, are achieved when the transistor is operated at a point near the edge of saturation."  '741 Patent, col. 1, ll. 55–58.   A transistor may be pre-set to operate in saturation, with a pre-determined drive current and temperature.  However, such a circuit is vulnerable to either moving deeper into saturation, as excess base drive increases, or falling out of saturation altogether.  '741 Patent, col. 1, ll. 14–col. 2, ll. 19.

109.    The '741 patent, issued on July 5, 1988, teaches that in many applications, in order to optimize efficiency, it is desirable that a transistor operate in saturation during the on-condition.  The patent states that "typically, minimum power dissipation, and optimum overall efficiency, are achieved when the transistor is operated at a point near the edge of

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

saturation." '741 Patent, col. 1, ll. 55–58.   A transistor may be pre-set to operate in saturation, with a pre-determined drive current and temperature.  However, such a circuit is vulnerable to either moving deeper into saturation, as excess base drive increases, or falling out of saturation altogether.  '741 Patent, col. 1, ll. 14–col. 2, ll. 19.

110.    The '741 patent, issued on July 5, 1988, is entitled "ADAPTIVE TRANSISTOR DRIVE CIRCUIT."

> [This] invention relates to a circuit for adaptively adjusting the operating point of a transistor in saturation to maintain the forced current gain of the transistor within a desired range throughout a desired range of load currents and operating temperatures.  More particularly, this invention relates to an adaptive transistor drive circuit for use in association with a transistor switch subject to varying load conditions and operating temperatures.

111.    '741 Patent, col. 1, ll. 5–13.  In other words, the invention aims to give the user of this drive circuit the ability to maintain an operating point in the more efficient region of saturation at varying temperatures and current levels.

112.    Figures 3 and 5 of the '741 patent illustrate a switch circuit and an integrated circuit switching voltage regulator, respectively, each utilizing an embodiment of the adaptive transistor drive feature of the invention.  '741 Patent, col. 3, ll. 29–31, 34–37.



FIG. 3

113.     In Fig. 3, a fixed current source $I_2$ provides base drive sufficient to drive transistor switch 300 into saturation at lower levels of collector current.  However, the level of $I_2$ is not set high enough to drive switch transistor 300 into saturation at higher levels of collector current.  Thus, at low collector currents, the circuit is efficient.   However, in order to operate at higher collector current levels, extra circuitry is required to provide additional base drive current.  '741 Patent, col. 7, ll. 14–61.

114.     The '741 invention provides another source of drive current $I_3$ which, in conjunction with $I_2$ and functioning as an offset current, adapts the circuit automatically to variations in collector current through switch transistor 300 to maintain a saturated condition.  '741 Patent, col. 7, l. 62–col. 8, l. 26.

115.     In Fig. 3, amplifier 311 senses the collector current flowing through series resistor 309 and increases drive current $I_3$ as collector current increases.  The total base drive current thus adaptively increases as necessary to maintain the transistor's operation in saturation at higher collector currents.  '741 Patent, col. 7, ll. 25–62.

116.     The invention also includes circuitry for preventing the switch transistor from operating too deeply in the saturation region, as would happen if too much base drive current is provided.  Two examples are described in the '741 patent, both of which reduce base drive current if the switch transistor begins to saturate too deeply.  '741 Patent, col. 8, ll. 27–51; col. 12, l. 31-col. 13, l. 3.

117.     In Fig. 3, an extra emitter 301 is added to the switch transistor 300.  When the transistor saturates, this emitter conducts current.  By connecting this extra emitter to the source of base drive current as shown in Fig. 3, the current conducted by the extra emitter subtracts from the base drive current, reducing the base drive current that would otherwise

United States District Court
For the Northern District of California

reach the base of the transistor switch, thereby limiting the overdrive and depth of saturation.  The extra emitter is referred to in the '741 patent as a "tied-back emitter."  '741 Patent, Fig. 5 and col. 8, ll. 27–51.

118.     Similar to Fig. 1, in Fig. 5 the adaptive transistor drive circuit sums currents $I_2$ and $I_3$ from two current sources and adapts the circuit automatically to variations in collector current through switch transistor 300 to maintain a saturated condition.  '741 Patent, col. 9, l. 20–col. 11, l. 61.



119.     Fig. 5 illustrates an alternative circuit (circuit 572) for limiting the depth of saturation.  Fig. 5 is a simplified drawing of the circuitry used in the LT1070.  '741 Patent, col. 12, ll. 35–40; Nelson Testimony, 186:22–190:7.   In this circuit, transistor 578, current source 574 and diode 580 are arranged in a loop with the collector-base voltage of switch transistor 300 and the base-emitter diode junction of drive transistor 306.  '741 Patent, col. 12, ll. 49–53.

120.    Current source 574, resistor 576, and transistor 578 operate like a low voltage diode—with a diode voltage drop of approximately 0.3 volts.  '741 Patent, col. 12, ll. 44–46.  To prevent the transistor from falling too deeply into saturation, transistor 578 and diode 580 conduct current away from the base drive transistor, thus reducing the base drive current that would otherwise overdrive the base of switch transistor 300.  '741 Patent, col. 12, ll. 58–66.

121.    In essence, the goal of the '741 patent is to provide an adaptive transistor drive circuit which, through the pre-determination of desired variables—such as the ratio of collector to base current—works to maintain the transistor's point of operation "within a desired range of a chosen point in saturation."  Consequently, the efficiency of a switch is optimized or the efficiency of an integrated circuit switching voltage regulator circuit is improved.  '741 Patent, col. 2, ll. 30–40, 44–57, 64–68.

### B.    Saturation

122.    The only dispute with respect to infringement is whether Micrel's devices operate in saturation.  Micrel has stipulated that all other elements of all asserted claims of the patent-in-suit are met.  Blauschild Testimony, 365:17–366:7.

123.    During the limited claim construction performed by this court in 2004, the court found that the heart of the parties' dispute lay in (and hence the issue of infringement turned on) the construal of the phrase "in saturation."  In its January 2004 claim construction order, the court determined that the phrase "in saturation" specified that "the art [is operating] expressly and exclusively in the region of saturation.  Thus, where 'in saturation' is used in a '741 patent claim, it is used to denote the working of the covered invention consistently at a state of forced current gain."  Claim Construction Order, Def.'s Exh. A-224 at 17:3–6.

124.    Although in its claim construction order the court provided some guidance with

respect to the region of saturation and the onset of saturation, the court did not specify

whether the "knee" or "elbow" region of the lines in Fig. 1— representing output

characteristics of a typical silicon bipolar junction transistor as a function of the base

current—are in saturation.   These characteristics lines are labeled 100, 102, 104, 106, 108

and 110 in  Fig. 1 below.  Micrel's accused products operate on the knee of the

characteristic curves.



**FIG. 1**

1.   **The '741 patent's Characterizations and Definitions of "in Saturation"**

(a).   <u>Line 112 of Figure 1</u>

125.   The '741 patent describes three operating regions for a transistor in Figure 1:  the cutoff region, the active region, and the saturation region.  '741 Patent, col. 3, ll. 53–55; Blauschild Testimony, 330:6–12.

126.   In the section entitled "DETAILED DESCRIPTION OF THE INVENTION," the patent teaches that the "shaded area 101 between line 100 and the ordinate of the graph *is* the cut-off region" and that the "active region" is "*represented* by the shaded central region of graph 103."  The '741 patent states that the "saturation region" is "*defined* by the saturation line 112 in FIG. 1."  '741 Patent, col. 3, ll. 65–col. 4, ll. 21. (emphasis added).

127.   Micrel's contention that Line 112 itself comprises the entire area of saturation is not supported by the patent terms or by scholarly texts.  Line 112 "sets the [outer] boundary of saturation. . . . you can decrease the voltage across the transistor going left to right here, and you could go along any curve, but you can't go past that boundary."  Blauschild Testimony, 340:22–25.

128.   Further, as discussed *infra*, a person of ordinary skill in the art would not understand the saturation region to be limited to Line 112.

129.   In support of Micrel's position that operation on the knee of the curve is not in saturation, McAlexander asserted that Fig. 1 had a fourth region of operation—the "transition" region.  <u>See</u> Pl.'s Exh. 456; McAlexander Testimony, 879:25–16, 880:16, 881:6–10.

130.    Essentially, by arguing that there is such a transition region, McAlexander seeks to create a gap between the end of the active region and saturation and thus create a space wherein Micrel can operate without infringing the '741 patent.  Pl.'s Exh. 456; Trial Testimony, 880:8–10, 885:2–7.

131.    However, this novel position is wholly unsupported.  As McAlexander conceded at trial, the '741 patent makes no mention of a transition region.  McAlexander Testimony, 880:14–23.  The only regions specified are the cutoff, active and saturation regions.  '741 Patent, col. 3, ll. 53–55.

132.    Further, a person of ordinary skill in the art would not have understood there to be a transition region.  None of the textbooks proffered during trial identified a transition region and McAlexander provided no evidentiary support for this proposition.  Blauschild Testimony, 2055:11–2056:21.

### (b).    '741 Patent's Formula Denoting Onset of Saturation

133.    The '741 patent provides a formula to determine the onset of saturation: "The saturation region *commences* for any particular collector current when the base current $I_B$ multiplied by $h_{FE}$ is equal to $I_{CSAT}$, where $h_{FE}$ is the DC collector base current gain and $I_{CSAT}$ is the current through the collector."  '741 Patent, col. 3, l. 66–col. 4, l. 2 (emphasis added).  In other words, saturation begins when  $I_B \times h_{FE} = I_{CSAT}$.

134.    $h_{FE}$ is the specific current gain in the transistor for the active region.  '741 patent, col. 3, l. 66–4, l. 2; Pl.'s Exh. 455 (Slides 19–21); Blauschild Testimony, 341:3–342:7.

135.    A person of ordinary skill in the art would understand that $h_{FE}$ is a reference to the transistor's current gain in the active region.  Textbooks written in this area provide support for this proposition.  Pl.'s Exh. 455 (Slide 22); Blauschild Testimony, 342:17–343:7.

136.    Based upon the above-stated formula in the '741 patent, the saturation region commences where an active region value of collector current ($I_B$ multiplied by $h_{FE}$) is equal to a saturation region value of collector current ($I_{CSAT}$).  Since $h_{FE}$ is defined only in the active region, there is only one point where this occurs, and it is the point at the end of the active region.  The saturation region therefore includes the curve leading to the active region.  Pl.'s Exh. 455 (Slide 27); Blauschild Testimony, 343:21–344:17.

137.    Micrel misconstrues the function of this equation when it asserts that the Accused Products do not "meet this criteria."  The equation purports to describe the onset of saturation for a particular base and collector current and not to determine if a chosen operating point meets the requirements of the equation.  An operating point would only satisfy the requirements of the equation if it operated at the point when saturation commenced—per the specifications of the patent.  See McAlexander Testimony, 746:16–747:12; Blauschild Testimony, 2053:18–2055:7.

138.    The notion that saturation commences at the boundary between the straight line of the active region and beginning of the curve is consistent with the court's claim construction order.

    As the '741 patent makes clear, the edge of saturation is a gradual one, beginning where the active region ends and curving at the point at which base current is diverted to the collector.  For any base current level, saturation depth increases as the operating point of the transistor moves down and left along the curve of the base current line.

Def.'s Exh. A-224 at 18 n.3; see also Pl.'s Exh. 455 (Slide 28); Blauschild Testimony, 344:18–345:6.

139.    The "edge of saturation" is the point at which the transistor leaves the active region and enters saturation—the point when base current begins to be diverted to the collector.  Blauschild Testimony, 159:23–360:17.  The deeper a transistor is in saturation, the greater

**United States District Court**
For the Northern District of California

1  the diversion of base current to collector current.  Blauschild Testimony, 360:22–361:1.

2

3  140.    This teaching is consistent with how saturation has been taught and described to

4  persons of ordinary skill in the art.  Pl.'s Exhs. 199, 246–248, 255, 460, 455 (Slides 29–33);

5  Blauschild Testimony, 339:3–22, 345:7–18; McAlexander Testimony, 886:13–888:23.

6

7

8

9                    **(c).    Series Model Approximation**

10  141.    Fig. 2 of the '741 patent shows an approximation of the "elbow" or "knee" of one of

11  the characteristic output lines of Fig. 1.  Horizontal line 202 represents an "approximation of

12  transistor operation in the saturation region" and vertical line 200 is "an approximation of

13  transistor operation in the active region.   The actual curve that an operating transistor

14  produces is represented by line 204.  '741 Patent, col. 4, ll. 51–65; Blauschild Testimony,

15  345:22–346:2.

16

17

18

19

20

21

22

23

24

25  142.    The '741 patent describes a theoretical operating point where line 200 and 202

26  meet—point $Q_M$.   This is not an actual operating point, but a theoretical point on the

27

28

                                          37

approximated model of a transistor.  Blauschild Testimony, 346:5–10.   Point $Q_M$ approximates the "onset of saturation." '741 Patent, col. 4, ll. 65–68.

143.    The '741 patent states that "at a collector current $I_C$ corresponding to operating point $Q_M$, the actual transistor will operate at a collector-emitter voltage $V_{CE}$, which is higher than that predicted by the series resistance model."  In other words, for a given collector current, the transistor will operate at a less efficient point—with a higher voltage than that of the series model.  Indeed, the patent notes that cross-hatched area 208 represents the "overall difference in efficiency between the actual transistor and the series resistance model."  '741 Patent, col. 5, ll. 1–16.  When a base current is applied that would theoretically cause the transistor to operate at point $Q_M$, the transistor will actually operate where lines 200 and 204 meet.

144.    The '741 patent states that to "overcome the difference in efficiency, the actual circuit must be designed to drive the transistor [from the operating point on the actual curve 204 corresponding to $Q_M$] to an operating point *deeper into saturation to ensure operation in the saturation region*."  '741 Patent, col. 5, ll. 1–16 (emphasis added).

145.    Thus, the patent describes the operating point on the actual curve that corresponds to point $Q_M$—the highest point on figure 2—as being in saturation.  Accordingly, all the points on curve 204, from the highest point to the origin, are in saturation.  Pl.'s Exh. 455 (Slides 34–36); Nelson Testimony, 185:25–186:21; Blauschild Testimony, 345:19–347:9.

146.    The fact that the patent teaches that points 116, 118, 120 and 122 are operating points "near the edge of saturation" is consistent with the foregoing.  To keep the device from falling out of saturation and into the active region, the patent teaches that the invention drives the device deeper into saturation to "ensure" operation in saturation.  See '741 Patent,

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

col. 5, ll. 1–16.  Thus, the edge of saturation begins at the highest point of the curve

204—the end of the active region.  The illustrative operating points are all lower on the

curve and thus they operate deeper in saturation and close to this "edge of saturation."  <u>See</u>

'741 Patent, Fig. 1.

### (d).  Forced Current Gain/Forced Beta

147.     The current gain ($\beta$) of a transistor is the ratio of collector current $I_C$ to base current

$I_B$.  '741 patent, col. 4, ll. 24–26.

148.     Forced current gain is "the current gain of a transistor in saturation . . . [which has

been] forced lower by excess base current."  '741 patent, col 4., ll. 33–35.  The current gain

is "forced lower" because when a transistor is operating in saturation, the drive current

provided to the transistor exceeds the value necessary to produce the collector current $I_C$

which results."  '741 patent, col. 1, ll. 39–45.  In other words, in the saturation region, to

achieve the same level of current that was achieved in the active region, an excess of base

current must be applied.  Blauschild Testimony, 363:2–5.  Thus, the ratio (or current gain)

results in a lower value since the denominator in the equation—the base current—has

increased significantly.

149.     The practical way to measure saturation is through computations of forced beta.  It is

possible to measure the base and collector currents of a transistor.  The operating points of

the transistor on a curve can also be measured, and it can be determined whether there is

excess base current, indicating saturation.  Nelson Testimony, 183:7; Blauschild

Testimony, 352:22–353:4.

150.     Using Fig. 1 to illustrate, the patent teaches that "when a transistor is operating on

the saturation Line 112, an increase in base current $I_B$ does not result in an increase in

39

collector current $I_C$." '741 Patent, col. 5, ll. 50–53.   Similarly, in the knee portions of the lines on Fig. 1, excess base current is required to operate at the same level of collector current.  Blauschild Testimony, 369: 6–8.

151.    In the active region, changes in voltage result in small changes in current.  However, in the saturation region, a small change in voltage results in a substantial change in current. Blauschild Testimony, 375:5–12.

### (e).   Forward Bias

152.    This court's claim construction found that "[i]n the context of the '741 patent, 'saturation' denotes a state of forced current gain in which *both* the emitter-base and collector-base junctions of a transistor are *forward-biased*."  Def.'s Exh. A-224 at 12:16–21 (emphasis added).  The patent states that another way of characterizing saturation is that both emitter-base and collector-base junctions are forward biased.  '741 Patent, col. 4, ll. 2–5.

153.    In a transistor, the base-emitter diode is at the junction between the base and the emitter terminals and the base-collector diode is at the junction between the base and the collector terminals.  Diodes are one-way valves which either permit current to flow or prevent it from flowing. McAlexander Testimony, 689:15–692:19.

154.    In the cut-off region neither the base-emitter nor the base-collector diodes conduct current.  In the active region the base-emitter diode conducts current, but the base-collector diode does not.  In the active region, the base-collector junction is reverse biased and there is no resultant current flow.  The reverse biased region corresponds with the straight section of the characteristic output line.   Blauschild Testimony, 358:11–359:25.

United States District Court
For the Northern District of California

155.    In the saturation region, both the base-collector and the base-emitter diodes conduct current—they are forward biased.  In this latter situation where both diodes are forward biased and conducting an appreciable amount of current, the transistor is referred to as being in a state of forced current gain.  McAlexander Testimony, 696:17–21.  Forced current gain is achieved when both junctions are forward biased.  Blauschild Testimony, 433:11–22.

156.    "Forward biasing" is understood by a person of ordinary skill in the art to mean that there is enough positive voltage across the junction to cause significant current flow, which is current flow that can be observed or measured.  Blauschild Testimony, 347:24–348:4.

157.    Engineers make a distinction between forward bias and positive bias.  Although a junction may have some positive voltage, it is not considered forward biased until there is a measurable effect—some significant current flow.  Blauschild Testimony, 359:16–20; 435:4–8.

158.    During prosecution, LTC represented to the PTO that forward bias occurs "when the junction becomes so positively biased that a *significant* portion of base drive provided to the transistor is diverted to the transistor's collector."  Def.'s Exh. 123 at 838 (emphasis added).

159.    The claim construction provides that a transistor is thus in saturation when the collector-base junction becomes so positively biased that a *substantial* portion of base drive is diverted to a given  transistor's collector."  A-224 at 10:16–24 (emphasis added).  At trial, Nelson also testified that the term forward biased describes a condition whereby the collector-base junction is conducting "a *significant* amount of current."  Nelson Testimony, 212:9–215:19 (emphasis added).  At trial, LTC's expert, Blauschild, testified that forward biasing occurs when there is the flow of "*appreciable* current."  Blauschild Testimony, 435:22 (emphasis added).

41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

160.    Micrel's attempts to draw a distinction between LTC's use of "significant" during prosecution and "appreciable" at trial is unpersuasive.  LTC's positions during prosecution and at trial are not inconsistent.  The Oxford English Dictionary defines appreciable as "capable of being estimated, weighed, judged of, or recognized by the mind."  The Oxford English Dictionary 581 (2d ed. 2001).   "Significant" is defined as something "important, notable."  Id. At 458.  Consequently, this court's determination that forward biasing. occurs when a "substantial" amount of base drive is diverted to the collector still holds.  Forward biasing occurs when the junction of a transistor becomes so positively biased that a measurable, and therefore substantial, amount of base drive is diverted to the collector.

161.    Further, the way in which diodes operate, as illustrated by Blauschild in Def.'s Exh. 486 (slide 3), demonstrates that there is measurable current from the diode which commences at a point after the origin and later increases exponentially.  The characteristics of a diode's operation is represented by a line that curves upwards, away from the origin.  This is because the physics of a diode specify that once a diode reaches a forward bias point, it starts to increase gradually.  The diode has an exponential characteristic, so a curve results.  Def.'s Exh. 486; Blauschild Testimony, 2048:14–19.

162.    The court does not find McAlexander's expert opinion on the physics of diode operation credible.   McAlexander asserts that the diode characteristic is initially represented by a horizontal straight line with no appreciable current and then at the point of forward biasing by a vertical line representing substantial current.  See McAlexander's Testimony, 692:25–693:12.  The model presented by Micrel to support this proposition is a simplified model which does not offer the actual performance characteristics of a diode.  Blauschild Testimony, 2088:25–2090:2

United States District Court

For the Northern District of California

163.    The base-collector junction of a transistor is forward biased when the operating point of the transistor is on the curved portion (i.e., the knee or elbow) of the transistor's output characteristic line.  This is confirmed by textbooks and teaching materials.  Blauschild Testimony, 347:24–349:8, 357:21–361:3; Pl.'s Exh. 455 (Slides 44–45, 46); Pl.'s Exhs. 255, 257.

164.    The curve in the characteristic output line of a transistor is caused by the base-collector junction forward biasing and thus saturation includes all points on the curve leading up to the boundary with the active region.  Blauschild Testimony, 347:14–23; '741 patent, col. 4, ll. 2–5); Pl.'s Exh. 455 (Slides 42–43).

165.    It is not correct, as Micrel has asserted, that a base collector junction requires a positive voltage of approximately 0.6–0.7 volts to be forward biased.  The '741 patent describes a transistor being in saturation at a base-collector voltage of 0.3 volts.  '741 Patent, col. 12, ll. 58–64; Pl.'s Exh. 455 (Slides 50-52); Blauschild Testimony, 353:5–357:20.

## 2.    Instantaneous Change From Cutoff to Saturation Line 112 is Unsupported

166.    The '741 specification states: "An ideal switch is one which is capable of controlling a wide range of switch currents with no power dissipation and with an instantaneous transition from a conducting state to a non-conducting state and vice versa."  '741 patent, col. 1, ll. 18–21.   In actuality, the patent teaches, transistors *do not* fit the ideal description of a switch that transitions instantaneously.  See  '741 Patent, col. 1, ll. 22–26.  Transistors "most closely approximate an ideal switch when operated in the saturation region during the 'on' condition of the switch and in the cut-off region during the 'off' condition of the switch."  '741 Patent, col. 1, ll. 22–26.

43

United States District Court
For the Northern District of California

167.    Micrel's expert testified that in order to approximate an ideal switch, the transistor must make a virtually instantaneous change from cutoff to saturation, without any measurable amount of base current and without going into the active region.  McAlexander Testimony, 671:21–673:5; 674:6–12; 676:5–678:13; and 826:13–832:12.   However, the patent expressly states that there is a period of approximately 50–500 nanoseconds when transistor 300 is being turned on where "transistor 300 is driven from a cutoff state to *at least the active region* of operation."  '741 Patent, col. 8, l. 65–col. 9, l. 1 (emphasis added).

168.    The patent teaches that in the drive circuit of Fig. 3, current source 312 initially generates a current $I_2$ which is increased after a short delay to $I_2'$.  This "short delay" is also specified as consisting of 50–500 nanoseconds—the same period of time in which we are told the transistor moves from the cutoff region to at least the active region.  '741 Patent, col. 7, ll. 36–40.  The initial current ($I_2$) is enough to turn on transistor 300 when the voltage across the transistor ($V_{CE}$) is high— as in the case when transistor 300 is off.  '741 Patent, col. 7, ll. 41–47.  As the patent states, current source 312 of Fig. 3 "generates current $I_2$ when transistor 300 is off and $I_2'$ when transistor is on."  '741 Patent, col. 8, ll. 54–55.  As discussed *supra*, $I_2'$ is sufficient to drive the switch into saturation at low currents and non-extreme room temperatures.  '741 Patent, col. 8, ll. 1–4.  The variable current $I_3$ is added to help drive the transistor into saturation at higher currents and temperatures.

169.    The transistor must enter the active region before reaching its operating point in saturation because once transistor 300 is turned on, $V_{CE}$ will start to come down as the transistor begins to conduct collector current.  To conduct collector current, the transistor cannot remain in the cutoff state.  It must enter at least the active region.  See Fig.1 (an increase in collector current without a concomitant decrease in voltage would necessarily place the transistor in the active region of operation).  Then, once the transistor is on and conducting collector current and $V_{CE}$ starts to come down, the base current $I_2$ is increased to $I_2'$.  The combination of $I_2'$ with the variable current $I_3$ is what drives transistor 300 into, and

44

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

maintains it in, saturation. $V_{CE}$ does not move from a high to low instantaneously, but only after a "short delay." '741 Patent, col. 7, l. 41–48, l. 26; Blauschild Testimony, 2059:24–2060:13, 2063:5–14.

170.    Micrel is incorrect in its assertion that to find that a transistor enters the active region, for a brief moment as it turns on, is contrary to the asserted claims of the '741 patent—which require that the transistor operate exclusively in the region of saturation. McAlexander Testimony, 839:5–841:16 and 918:3–920:14; Claim Construction Order, Def.'s Exh. A-224 at 17:3–4.  The patent does not teach that the transistor operates in the active region, but merely that in reaching its operating point it passes briefly through the active region—as it must with an increase in collector current.   Thus, although the transistor must start off going into the active region, the combination of the fixed and variable base currents provided by the adaptive base drive circuitry ensures that the operation point is in saturation.  Blauschild Testimony, 2064:20–2067:6.

171.    Blauschild's oscilloscope trace does not lend support to McAlexander's theory regarding the virtually instantaneous transition of a transistor from cutoff to saturation as it is a simplified model utilizing a filter and a low frequency scope.  These limitations preclude an accurate illustration of the transistor's operation.  The simplified oscilloscope trace appears to demonstrate that when base current is applied to the Micrel transistor, collector-emitter voltage falls to zero almost instantaneously, without significant collector current.   McAlexander Testimony, 833:18–834:20 and 925:3–928:12; Pl.'s Exh. 455 at slide 116; Blauschild Testimony, 2095:2–2097:10; Def.'s Exh. A-1033.

**C.    Micrel's Accused Products Infringe the '741 Patent**

172.    The parties have agreed that the structure that is in each one of the accused devices is essentially the same, and for purposes of infringement, determination of infringement or

United States District Court

For the Northern District of California

non-infringement on one device would apply equally to the others.  McAlexander Testimony, 731:8–15, 731:2–8.

173.    Therefore, the analysis below regarding the MIC2172 also applies to the MIC3172 and the MIC2172, which share the same infringing circuitry as the MIC2172.  Pl.'s Exhs, 125, 126.

174.    The test results discussed below demonstrate that the claimed circuitry in the accused MIC2171, MIC2172 and MIC3172 products operates on the knee of the output characteristic line. See, e.g. Def.'s Exh. A-560 (reproduced below) which demonstrates graphically the operating point of the MIC2172.  The test results also demonstrate that at the operating points of these devices, both junctions are forward biased and operating in a state of forced current gain.

175.    The graph below only represents a small sub-section of the characteristic output line of the MIC2172.  Specifically, only a small fraction of the active region is represented graphically.  On a larger scale graph, if the full active region were to be plotted, then the curved areas of the graph would likely "smouch[sic] together . . . [forming] a line." Blauschild Testimony, 337:13–21.



1. **LTC's testing of the MIC2172 Demonstrates Operation in Saturation**

176.    LTC's technical expert, Blauschild, tested MIC2172 parts using two test methods. Blauschild Testimony, 371:6–25.

177.    Blauschild reviewed the patent, the claim construction order and Micrel's testing results of the MIC2172 parts.  After reviewing this information, and after conducting his own tests of the MIC2172, he concluded that the MIC2172 meets all of the requirements of the asserted claims of the '741 patent.  Blauschild Testimony, 327:14–15.

178.    Blauschild first tested the MIC2172 using the Typical Application shown in Fig. 1 of the Micrel 2172 datasheet.  Blauschild measured two MIC2172 parts.  The MIC2172 switch transistor operated in saturation.  Pl.'s Exh. 455 (Slides 113–18); Blauschild Testimony, 372:6–377:5.

47

179.    Blauschild conducted further tests on one of the MIC2172 parts and concluded that it operated in saturation.  Blauschild noticed that when he varied voltage slightly, there was a substantial change in collector current—suggesting that the transistor was operating in saturation.  Pl.'s Exh. 455 (Slide 119); Blauschild Testimony, 376:15–377:5; 377:6–381:21.

180.    Blauschild also tested an LTC LT1172 part.  The results confirm that the switching transistor in the LT1172 operates in saturation.  Pl.'s Exhs. 243, 344 (Slide 122); Blauschild Testimony, 371:6–10, 377:6–15, 377:7–9, 380:9–381:20, 485:18–489:23.

181.    Blauschild further demonstrated, using Micrel's own measurements, that the MIC2172 operates in saturation because it produces excess base current—". . . the drive current provided to the transistor exceeds the value necessary to produce the collector current $I_C$ which results . . . ."  '741 patent, col 1, ll. 39–45; Pl.'s Exh. 455 (Slide 60); Blauschild Testimony, 367:2–369:15.  Thus, for any given operating point of the Micrel 2172, one could achieve the same collector current if one were to operate in the active region.

182.    Blauschild found that at 7.7mA (with 880mA of collector current), one could achieve the same 880mA of collector current with a 6.9 mA base current.  Thus, at 7.7mA, the MIC2172 generated 0.8 mA of excess base current.  Similarly, Blauschild found that at 9.2 mA, the MIC2172 generated 2.3 mA of excess base current.  Pl.'s Exh. 455 (Slide 60); Blauschild Testimony, 368:22–369:15.

183.    Blauschild used Micrel's test data to show that the current gain at the operating points for the Micrel parts was reduced by about 20% from the current gain in the active region.  The current gain in the active region was almost 125, while current gain on the knee

48

of the curve was approximately 98.  Pl.'s Exh. 455 (Slide 111); Blauschild Testimony, 369:16–22.

2.      **Micrel's Testing of the MIC2172 Demonstrates Operation in Saturation**

184.    Micrel's technical expert, Joseph McAlexander, also tested the MIC2172 parts. McAlexander Testimony, 731:14–22.

185.    McAlexander tested the MIC2172 by removing the top of the package and plotting the device's response to different currents and voltages.  McAlexander Testimony, 731:19–732:5.

186.    McAlexander first measured the switching transistor (connected as it normally operates) to obtain the operating point.  McAlexander Testimony, 732:6–9.

187.    McAlexander then disconnected the controlling circuitry from the switching transistor and used probes to vary the current and voltage conditions applied to the transistor.  This allowed him to make additional measurements—specifically to determine what current level needed to be applied to the base to achieve the particular operating point. Def.'s Exh. A-560; McAlexander Testimony, 732: 10–17.

188.    McAlexander performed these measurements at three different values of base current (6.9 mA, 7.7 mA, and 9.2 mA) indicating each measured operating point with an "X." Def.'s Exh. A-560, A-561, A-562; McAlexander Testimony, 736:17–22.

189.    For each of the three values of base current, the measured operation point was towards the bottom of the knee or elbow, thereby demonstrating that the Micrel products

49

operate in saturation.  Def. Exhs. A-560, A-561; Blauschild Testimony, 363:12–365:5; McAlexander Testimony, 736:17–22; 734:20–23.

190.     McAlexander conceded that at the operating points of the Micrel parts, there will be conduction of current from the base to the collector that contributes to the reduction in current gain.  McAlexander Testimony, 852:2–853:13.

191.     At trial, in demonstrating that Micrel's operating points do not meet the formula outlined in the patent for the "onset" of saturation, McAlexander presented a calculation that confirmed the Micrel parts are in saturation.  McAlexander testified that the average beta in the active region for a MIC2172 is 125.  Then he demonstrated that at a base current of 9.2 mA, the ratio of collector current to base current at the operating point of the Micrel part was 93 ($I_C/I_B = 860/9.2$).  This is a reduction in current gain of 34 percent from the current gain of 125 in the active region—indicating that the MIC2172 operates in saturation.  Def.'s Exh. A-559; McAlexander Testimony, 747:5–748:25.

192.     The Micrel engineer responsible for the MIC2172, Bud Miller, performed tests during design of the MIC2172 part that also showed the part to be in saturation.  Referring to data in the datasheet for the Micrel part, taken from measurements he made, Miller calculated that the switching transistor in Micrel's part typically operated with a current gain of 111.  The datasheet also showed that the current gain could be as low as 50.  Miller testified in deposition prior to trial that beta of a transistor in Micrel's process ranged from 125 to 300.  Thus, Miller's data showed that the switching transistor in Micrel's part was operating at a reduced current gain, i.e., a forced current gain, and therefore was in saturation.  Def.'s Exh. A-394; Miller Testimony, 597:3–599:1; 632:14–634:24.

193.     Miller understood when he designed the MIC2172 that reduced current gain was a significant indicator of saturation.  Miller Testimony, 592:10–593:6.

50

1   194.   At trial, Miller claimed that a "standard" for saturation existed for "discrete"

2   transistors under which current gain had to be reduced to a value of 10.  Micrel did not offer

3   any evidence in support of this purported industry standard and Miller made no reference to

4   such a standard in his deposition testimony.  Moreover, the '741 patent, of which Miller was

5   aware, clearly described examples of forced current gain values in excess of 10, and showed

6   saturation occurring at current gain reduction of about 20 percent, approximately the same

7   as in the Micrel products.  Miller Testimony, 593:1–25, 62:6–630:9; Blauschild Testimony,

8   2068:1–2069:25; '741 Patent, col. 1, ll. 62–12, l. 7.

9

10   195.   McAlexander does not disagree with the results of Blauschild's testing, and

11   reproduced the testing using Mr. Blauschild's method.  Similarly, Mr. Blauschild does not

12   disagree with Mr. McAlexander's results.  Blauschild Testimony, 451:8–19; McAlexander

13   Testimony, 749:14–750.

14

15   196.   Tim Rust (a Micrel engineer) testified that the Micrel devices *do not* operate in the

16   active region.  Rust Testimony, 1603:4–12.  At trial, when McAlexander was asked if his

17   results were operating in the active region (since Micrel was unwilling to concede that their

18   devices operated in saturation), he was unable to give a definitive answer.  Rather, he stated,

19   ". . . I would much prefer to say it is operating not in the saturation region, according to

20   what the claimed invention requires."  McAlexander Testimony, 751:24–752:3; 737:7–12.

21   However, this statement is inconsistent McAlexander's other statements with respect to

22   Micrel's operating points.  McAlexander also asserted that the accused devices operate off

23   *their* saturation line and "come up an entirely different slope . . . [towards the] active

24   region."  McAlexander Testimony, 744:20–745:6.  This understanding, McAlexander

25   asserts, is confirmed by Blauschild's oscilloscope trace, which shows that after Micrel's

26   operating point goes down to the ordinate, it rises at an angle above the saturation line and

27   then levels off, eventually reaching a point on the knee of the characteristic curve.  Implicit

28

in this argument is a concession that Micrel is operating in the active region—something which Micrel does not assert and thus is understandably not willing to admit to.  It is for this precise reason that McAlexander created a transition region of operation, wherein the Accused Products would not infringe.

197.    In summary, the Micrel accused devices infringe the asserted claims because LTC's and Micrel's testing show that over a range of collector currents and operating temperatures, the switching transistor of the Accused Products consistently operates in saturation.

**D.**    **Micrel's Testing of a 1990 SG1524 is Irrelevant to an Infringement Analysis**

198.    As part of its non-infringement arguments, Micrel offers evidence of testing it did on an SG1524 part made by Silicon General in 1990.  A 1976 version of this part was referenced in a Mammano article brought to the attention of the PTO during prosecution. See Section II.C.4. ¶ 80.  Micrel contends that LTC admitted during prosecution that the SG1524 does not operate in saturation, and that the SG1524 that Micrel tested operates at a point closer to saturation than Micrel's Accused Products—specifically at a point lower on the knee of the characteristic output curve of a transistor.

199.    Micrel's testing of a SG1524 made by Silicon General in 1990 is irrelevant to whether Micrel infringes the '741 patent because Micrel did not establish that the 1990 part it tested operates the same as any SG1524 part known to LTC, or in the same way as the 1976 Silicon General part described in the Mammano paper.

200.    There is no guarantee that the part described in the 1976 Mammano paper is the same as the 1990 part which Micrel tested.  McAlexander Testimony, 891:3–24.

201.    In support of his opinion that the LT SG1524 was the same as the 1976 Silicon General SG1524, McAlexander claimed that he compared the schematics for the Linear Technology SG1524 shown on the 1990 LTC datasheet with the schematics shown in Figure 13 of the 1976 Mammano Paper.  Pl.'s Exh. 458, Figure 13; Pl.'s Exh. 715 at 7–9; McAlexander Testimony, 901:19–902:5.

202.    However, McAlexander admitted that R51, shown in the LT1524/SG1524 schematics does not appear in the Mammano paper.  McAlexander Testimony, 903:3–16.

203.    McAlexander also admitted that the capacitor C7 that is shown in the Linear Technology Diagram is also not shown in the Mammano paper.  McAlexander Testimony, 903:18–904:3.

204.    McAlexander conceded that at the schematic level the SG1524 manufactured by LTC was different from what was described by the Mammano paper because of the presence of additional components.  McAlexander Testimony, 904:18–22.

205.    As Blauschild explained, if transistors are different sizes, or are made by different processes, they may have different operating points, and one may be in saturation while the other may operate in the active region.  Pl.'s Exh. 455 (Slide 50); Blauschild Testimony, 351:24–362:21.

206.    The 1976 Mammano article did not disclose the sizes of the transistors or resistors in the Silicon General SG1524 circuit.  Def.'s Exh. A-723; McAlexander Testimony, 889:9–14.  Therefore, without this information, an accurate comparison of the 1976 SG1524 cannot be made with the LTC SG1524 or Micrel's accused devices.

207.    In any event, Micrel incorrectly relies on statements made by LTC during prosecution.  LTC did not admit during prosecution of the '741 patent, or during

prosecution of any reexamination proceeding relating to the '741 patent, that the specific SG1524 measured by Micrel did not operate in saturation.

208.     During prosecution, LTC argued that the SG1524 discussed in the Mammano paper was modeled to operate out of saturation, but could be designed to operate in saturation. See Section II.A.2.4.(a) ¶¶ 74–77 *supra*.  There was no distinction made by the parties or by the PTO examiner between operation on saturation Line 112 and operation off saturation Line 112.  Moreover, LTC did not specify whether the operating point of this 1976 SG1524 was in or out of saturation.

209.     LTC believed that the SG1524 part (with which Dobkin was familiar) operated in the active region and not in the knee.  Dobkin's testing of delay times on the LTC SG1524 showed that that part was *not* in saturation, which is consistent with his understanding of LTC's  SG1524 datasheets.  Dobkin Testimony, 78:10-23, 110:24–111:9, 139:5–17, 144:18–22; Nelson Testimony 246:2–8.

210.     Further, Dobkin testified that if the 1990 Silicon General SG1524 tested by Micrel was operating in the elbow, there would be excess base current and it would be in saturation.  Dobkin Testimony, 138:21–139:17.

211.     For the foregoing reasons, the court will not consider the testing of the 1990 SG1524 in its infringement analysis.

**E.     Conclusion**

212.     After a thorough review of the patent specifications, claims, prosecution history and extrinsic evidence presented at trial, this court finds that the Accused Products all operate expressly and exclusively in saturation. Micrel's Accused Products literally infringe all the asserted claims of the '741 patent.

**United States District Court**
For the Northern District of California

## II.    DAMAGES

### A.    Intervening Rights

213.    Micrel, in seeking a reduction to the damages owed to LTC, asserts that it is entitled to absolute as well as intervening rights for Accused Products that were shipped or in inventory at the time of the B2 Certificate's issue.  Micrel also contends that it is entitled to equitable intervening rights for the amount it spent in substantial preparation of these products.

214.    Inventory can be calculated by taking the difference between the number of integrated circuits made and the number of integrated circuits sold.  Dragun Testimony, 1326:14–19; Pl.'s Exh. 462 at 7. Barker Testimony, 1752:25–1753:3.

215.    Integrated circuits are manufactured on wafers.  Each wafer can hold hundreds of integrated circuits (or die).  For purposes of calculating inventory, it is necessary to know how many die meet standards sufficient to turn them into a finished good and sold to customers—in other words the yield of a particular wafer.  The yield is a percentage calculated by taking number of good die on a wafer and dividing it by the total number of die on the wafer.  To determine the total number of die produced, the actual number of good die on each wafer is added together.  Barker Testimony, 1754:18–1755:7.

216.    The standard yield for a particular product wafer is based on the actual yields of that product over a period of time.  Standard yields are used to value inventories.  Barker Testimony, 1755:8–12, 1767:11–1768:17–23.

217.    Micrel did not produce the underlying actual yield data (found in its manufacturing databases) in order that the standard yields it utilized could be independently verified.

Barker Testimony, 1767:11–1769:5.  Barker admitted that he did not even recall looking for the actual yield data.  Id. at 1774:13–15.  Additionally, the documents that Barker relied on to calculate Micrel's inventory calculations are not reliable as it is unclear when they were created.  Barker conceded that he did not know the creation date of many of these documents.  Id. at1758:10–1760:25.

218.    Further, although Barker asserts that he used information from Micrel's die database to calculate inventory, Micrel did not produce all the underlying database information and LTC did not have an opportunity to inspect any of the records in that database.  Barker Testimony, 1758:8–1760:13.